Page number 24-1003 et al. Alphabet Workers Union-Communication Workers of America, Local 9009 Petitioner versus National Labor Relations Board. Ms. Campbell for Petitioner Alphabet Workers Union-Communication Workers of America, Local 9009. Ms. Silveira for Petitioner Cognizant Technology Solutions U.S. Corporation and Google LLC. Mr. Heller for the respondent. Good morning. Good morning. May it please the court, my name is Karla Campbell. I'm here on behalf of the Alphabet Workers Union Petitioner and Intervener in this case. The National Labor Relations Act makes the board responsible for remedying unfair labor practices. The board failed to do that in this case. Here, the employer failed to bargain with their employee's chosen representative, my client, which is a clear violation of the act. The union does not challenge the board's choice of remedy, but rather that the board failed to engage in reasoned decision-making when choosing the appropriate remedy. The board denied the non-monetary remedies the union requested without explanation. The board severed the question of monetary remedies for resolution at some later unspecified time. Of course, the board has broad discretion to craft remedies, but it is an abuse of that discretion to simply refuse to award remedies without analysis or explanation. The award of what the board calls a traditional remedy, a bargaining order, does not excuse reasoned decision-making. Here, the board's rubber stamp award of a traditional remedy is an abdication of its duty to consider the requested remedies in light of the circumstances of this particular case. What circumstances in this case make the traditional remedy inappropriate? Your Honor, the complexity of this case with the joint employer question in particular makes some additional remedies appropriate. For example... What do you mean the complexity? This is a joint employer case. Sure. I can use the example of a bargaining schedule, which was one of the non-monetary remedies that the union requested in its own motion for summary judgment. The question will inevitably come up in bargaining sessions when we get to that point, whether both employers have to attend every session depending on what topic is discussed, whether it be wages or benefits or some term or condition that the employer might or might not have control over. So, a bargaining schedule would have aided the parties in setting bargaining by eliminating some of those issues. That's going to all depend on certification challenge, as it would with any employer challenging certification. Sure. The bargaining order itself will apply to any challenge of the certification, and this is a test of certification. But the additional remedies, for example, the schedule would not necessarily come into play in a single employer that doesn't have the complexity of which employers have to be present for which bargaining session. That's an example. Do you have a view on whether the employer's petition here is moot, given that the contract has ended? Thank you for that question. The court asked in its motion about mootness in two particular instances. The contract is one the union does not, because the employers have not responded to the union's information request in addition to go hand-in-hand with the bargaining. We don't have direct knowledge of the status of the contract. However, the statement of work that's in the record was extended over a number of years. The original term was 2019 to 2020. It was extended through 2022. And my client's belief, although, again, not based on direct But I will say, importantly, even if there was not, even if the contract had expired completely and Google is now contracting with some other labor supplier to perform this work on the YouTube music platform, that would still not make this case moot. One of the reasons is that there are a number of pending ULP charges and for labor practice charges currently before the board. And contract ended, at least from the information we have so far, maybe we'll be corrected. The certification order was January 2024, beginning of January. The contract ended into February. So it's only a two-month period, probably a little less, probably seven or eight weeks, when the order was in effect to bargain and there still was a contractual relationship. On which the certification order, as to the joint employer issue was premised, would have still been in effect. You see, there was some other relationship. We don't have any idea what that relationship was or how it would map on to joint employer analysis. So I assume any of the claims for which you are seeking further remedies from the board would have to pertain. Let's assume, just for purposes of this question to you, that the relationship did end and their position is moot. Any of the extraordinary remedies you want would have to have been justified within that two-month period. Is that correct? They would have to have been, they would have to have accrued between certification period. January 3rd and February 29th. Correct. But again, I'm happy to take that assumption and play it out. There's still a dispute that presently affects the rights of the parties because, again, the joint employer question will, the board will inevitably face the joint employer question again if this court passes on it for the pending ULPs that happen during that that period between certification and assuming the contract ended. The damages question. Do you have unfair labor practices in that two-month period? We have unfair labor practices that are pending after certification, after certification. Are the unfair labor practices targeted Cognizant or Google? Both. They rely on the same joint question in which the board is going to look to this court's decision on that. Even if the contract ended, as we're making this hypothetical, if the court were to uphold the joint employer finding of the board, then both Cognizant and Google would have to engage in effects bargaining for the effects of the end of the contract and how that would impact the bargaining unit. So it doesn't, just the end of the contract doesn't absolve either party of its bargaining obligation. The board obviously had no ability to consider what remedies might be appropriate in the context of the contract ending at the time it made its decision awarding traditional remedies here. Correct. The remedies we've requested would, some of them are retrospective and some of them are perspective. And so for example, the cost of bargaining going prospectively, obviously that particular remedy would not apply if there was no longer a contract. But the retrospective remedies we've requested. Would an appeal still apply to Cognizant or does it just not apply to either one of them? I guess it would depend on, the YouTube music platform still exists. I think we can analogize this to the public citizen case that the court mentioned in its order and FERC case where FERC decided not to build this particular power plan. So there was no live controversy between the parties anymore. The product, if you will, in this case, the YouTube music platform still exists. And so it's not moot in the sense that that product has gone away. There's some group of workers that are still doing the work to keep that site up and going and largely error-free. So again, I apologize to the court that I don't have the contract. But again, even if the contract ended and Google hired some other labor supplier, that work is still ongoing and the charges that are before the board would still be a lot of controversy. I think I caught the answer to this early on in response to one of Judge Mollett's questions, but there are something like 60 Cognizant employees at issue in this case. Is that right? There were 41 that voted. I think there were closer to 50 in the actual bargaining unit. Let's take those. Let's take those 50. You don't know if those 50 Cognizant employees are doing any work for Google today. I do not. The other issue that the court raised, the rescission of the 2020 rule, I'll just mention that as my time expires, that my understanding is that the 2020 rule is actually still in effect. The 2020, the subsequent rule, it's called the 2023 rule, has been vacated by a federal court. In any event, of course, the board engages in rulemaking to guide its own decision-making, but ultimately this court applies a common law standard. And so regardless of the rule that applies, then even if it had been rescinded, which I don't believe it has, it would not make controversy moot. We'll give you a little time for rebuttal. Thank you. Good morning, Your Honor. May it please the court, Matt Silvera for Google. And I also am presenting argument on behalf of Cognizant today. We're here today because the board misapplied a joint employer rule that they were actively seeking to replace. Let's start with mootness to see if we're going to talk about joint employers. Sure. We thought about mootness when we filed our opening brief because the contract did expire in February. Why didn't you raise the issue and brief it other than just dropping a little tiny footnote? Because we don't think that the case is... But you still have an obligation to help us understand the basis for our jurisdiction. I think just dropping a footnote saying the contract that is the basis for the entire ruling here ended and not elaborating more. Sure. I'm happy to expand on that now. I apologize for that. It's not moot because, one, the board retained jurisdiction. Nobody gets to brief the other side of mootness. You're just developing it here now. Sure. So the board retained jurisdiction to issue a retrospective remedy. That's it severing the XLO issue. And so there's still a live dispute because there's a joint employer ruling that would be the premise for being able to issue that retrospective award if the court affirms the joint employer ruling. That issue was not before. The separate issue is not part of the order on review. Sure. But this is still a live issue because, again, if the court were to affirm the joint employer ruling, then that exposes us to that retrospective remedy. So there still is that live dispute there. A little bit of rightness problem there. Eminence problem. Well, no. And the other aspect of this, though... We can challenge that if and ever they rule on that. But we wouldn't be able to challenge the joint employer ruling. Because you would have ruled on the joint employer ruling. But what if they decide that there's no retrospective compensation due? We wouldn't challenge that decision, right? We wouldn't challenge that decision, but we would have lost the ability to challenge the joint employer ruling at that point. This is our only shot to challenge the joint employer ruling. It would be doing no work. The joint employer ruling would be doing no work. Well, the joint employer ruling has collateral consequences. As my opposing counsel noted, there are other ULPs that have been filed that are seeking to essentially leverage the joint employer finding here, based, for instance, on the conclusion of the contract. So if... It's all going to have to be redone. It's all going to have to be redone to figure out, one, we don't know which unfair labor practices are targeted, which you or both of you, at the same time, and whether they would still count as unfair labor practices if, in fact, certainly they pertain to a time period after the contract expired. So put aside those remedial questions on the... Put that aside. Sure. The contract... Has the contract expired? Yes, the contract expired on February 28, 2024. Is there any new contractual relationship between the two of you? No, not as...  Platform. Any cognizant employees working in the YouTube music platform, or have there been any since February 29, 2020? None in this party unit, certainly. I can make that representation. Okay. And so if we did not have them having preserved the XLO issue, would this case be entirely moved? Again, so long as the court is to vacate the underlying joint employer ruling, per its usual practice in SANS and under Munsingware, to allow re-litigation... Does that apply to agency decisions? Well, in SANS, VNLRB, this court has applied that same principle and said, as long as you're vacating the underlying decision to allow re-litigation of that issue, then that could work. But again, we do need that underlying joint employer ruling vacated. Otherwise, we're going to be stuck with it. We will have lost the ability to legally challenge it. I thought you just said that you can get that, even if the case is moved. So long as the court vacates the underlying... Yes, and understand... So that's the picture, is if mootness isn't caused by the party appealing. And here, it's caused by the party appealing who ended the contract. I disagree. You get the benefit of both. Yeah, I disagree. I don't believe that the mootness would be caused by the contract expiring. I don't think that... That is not the problem of the parties, right? You have a contract that has a set term, and when the contract expires, that doesn't mean that we are the ones that rendered the issue moot. I mean, we do have these other remedy issues, but beyond that, it's a contract that expired of its own terms. That's different from terminating employees. What a practice of extending it until the National Labor Relations Board said that Google was a joint employer, and then it wasn't extended. I think there had been two or three extensions, right? But they were yearly. I mean, the way this contract was set up was to allow the parties to consider it every year. I know, but the problem with vacature is you're having your cake and eating it too, right? You chose not to do the extension so that you wouldn't be bound by the board's decision. But then you also want to come here and say, oh, our ability to challenge that decision has been terminated through no action of our own. As I said, we're not advocating mootness, right? And we don't think that it is moot. But I'm saying if the court were to conclude that this case is moot, to saddle us with- To be clear, your only basis for that is the Accela Reservation. The Accela Reservation and the collateral consequences of allowing that joint ruling to stand, and not allowing us to re-litigate that issue in the pending ULPs. Okay, right. So that is where we are on mootness. This is why we didn't make the argument. We don't think it's moot. For the future, there's a substantial issue. This is not a small mootness question. It's a very, very large one. And we expect counsel on jurisdictional matters to be a bit more forthcoming in their briefing on such issues. Just going forward, please. I understand, Your Honor. As for the actual joint employer ruling, if the court determines that the case is not moot and is not going to vacate, we do think that the board simply misapplied that rule, and we know it was actively trying to replace it at the time. In doing so, it really did distort the operative rule and disregard the foundational precedence that the rule was expressly intended to codify. So we do think that the board, that the court, should be reversing that joint employer ruling in a way that makes companies arbitrary and capricious. If companies can't rely on the board to faithfully apply its own rules, then they can't structure their affairs with any reasonable expectation of compliance with those rules, affirming what also upend countless outsourcing relationships. You know, under the board's- Go back and tell me exactly which unfair labor practices you think keep this thing alive. Which unfair labor practices? You said that was the other- You said both except- Oh, sorry. The union has filed an unfair labor practice based on the expiration of the contract, right? And that is premised on the concept that we were, in fact, joint employers. So if we can't challenge- Have you ruled on that? No. The board is not- The board is waiting on that, in part because we have this joint employer ruling. So again, we're not going to be able to challenge- That is not before us. That is not before- That does not save this case from it. Well, it does in so much as the collateral consequences. But again, if we vacate the board's decision- Yes. Then that decision would have no collateral consequences. And in the new unfair labor practices about the contract expiring, you could make all over again the argument, which you may very well win, that you were not a joint employer. And nothing about this dispute would get in the way of you winning that dispute. Correct. So long as the joint employer ruling is vacated, that is essential for any sort of mootness determination. Okay. So you didn't argue mootness here because- I'm still confused about it. Because the whole premise is we want it vacated, which is dependent on mootness. It still seems odd to me that you didn't argue mootness and argue for vacature. Because we didn't think it was moot because of the fact that the board had retained the right to issue a retrospective remedy. But that would disappear with any mootness. No, not if- Well, unless the court were to vacate the joint employer. All right, so the question is for you.  Hold on.  So as for the joint employer ruling, if the court wants to hear about that as well, I In 2020, the board created a rule. It created a joint employer rule. And then the- You agree that governs this case? Yes, we do agree that governs this case. That rule is still- You agree that rule is still in effect? That is in effect. When the Eastern District of Texas vacated the 2023 rule, it also vacated the aspect of the 2023 rule that rescinded the 2020 rule, which means the 2020 rule comes back into place. So the 2020 rule is the operative rule. Now, when the board reached its determination in this adjudication, it noted that it had put out a notice of proposed rulemaking for the 2023 rule. In the adjudication, it didn't actually address any of the foundational precedents for the 2020 rule. And that's Ilerico and TLI and Airborne Express. These are all literally the NLRB decisions that the board said in the 2020 rule it was essentially adopting. It was saying, this is the path that we're going to take. We cited all those cases when we filed our request for review of the board, and they didn't distinguish any of them. They didn't take them on in any way. Yet in that same notice of proposed rulemaking, the board said, you know what? We disagree with TLI and Ilerico in that line of cases. So we have fundamentally- They were not applying the rule that had been passed through the 2020 rule. And you can see that when you actually walk through the various sub-findings on the three essential terms and conditions of employment that they said supported a joint employer finding. If you look at supervision, the first thing they talked about was training. Well, the preamble to the 2020 rule says, you know, we've considered training as an essential term or condition of employment, and we've concluded that's not going to be one of them. They settled with eight, and they said those are the eight exclusive terms and conditions of employment. When they talked about Google tools and processes, and again, this is a proprietary platform that Google has essentially contracted out to have people help to maintain the content, right, to ensure a cleaner and more accurate database is what the statement of work says. Obviously, you need Google tools and processes. The board, in its 2020 rule preamble, talked about the concept of the read factors, right, for independent contracting. Do you rely on tools and processes as a basis for a joint employer in this case? The board has four sub-findings under supervision. One is training, which I said the 2020 rule said we exclude. Second is Google tools and processes, which again, the 2020 rule preamble says, actually, we don't find that instructive. Then it looks at prioritization and rates of performance. Prioritization is something that's talked about in LERCO. It's talked about in Southern California GAS, the very board precedents that the 2020 rule was codifying and said, no, that's not indicative of a joint employer relationship. And then it looked at these QA rubrics. And the QA rubrics, that's fundamentally ensuring the performance that- I did say none of those factors are relevant in determining whether there's supervision. It did not say, no, but it didn't. Well, prioritization- You've got to look at something to figure out if you're supervising. Sure, but- You are training them and interacting with them daily with instructions on how to do their work and detailing and incredibly fine and minute levels, performance evaluations. You're telling me prior precedence says none of that is relevant. Yeah, I can see each of those. The training, I mean, that's advanced description of tasks, which is talked about in the rule as something that is permitted. That's a description when you're doing it every day. No, training happens, that's onboarding. That's when you start the job. No, you may continue training because there's new records here about new tasks and new things come along, then they're having to train them in the process. Well, no, first of all- Supervising them extraordinarily close level. I disagree with that view of the record. But again, the training is something that's advanced description of tasks. It really is. You're saying all this stuff, but the 2020 rules will never look at any of these things. What will they look at for supervision? The board will look at actually instructing individual employees on daily basis. That's not what we're talking about here. Training is something that Google created training materials that were given to cops. It's finding that that happens. What's that? If we read the order, it's finding that there was daily instruction on how to work, well as extensive training. And this is sort of an ongoing process because things change, new issues come up. Yeah, that was not the board's rationale. But if we were to read it that way, if they're reading the board's decision, you can- I'm not saying whether it is or not, but if you can't read the board's decision, that would be relevant. The board didn't just rubber stamp the regional director's decision here. The board looks through all of these factors and actually disagreed with the regional director on some such as direction. So I don't think we can then- And they actually took what the regional director had relied on as direction and said, you know, we'll put that over here in the supervision category. That's their prerogative. But the point is, I don't think that you can basically give the board additional rationales other than the ones that they expressly provided in their order. And that's all that we were able to actually review. Okay, thank you very much. Good morning, Your Honors. Joel Heller for the National Labor Relations Board. I will start with mootness. If the court would like to hear our view, I assume they did. So we also believe this case is not moot for many of the same reasons that have already been stated. It actually is clear from the various statements made by the other counsels that we just don't know on the basis of this record whether this work is still being done by cognizant employees. That can be determined in a subsequent compliance proceeding. Even if it's being done by cognizant employees, if it's no longer under the contract that was under review and there's no contract, I'm not quite sure how cognizant employees are doing it if there's no contract at all, there's going to be- Someone needs to figure out what on earth is going on and then analyze what on earth is going on in light of the joint employer rule. You couldn't rest on this record. Is that correct? That's correct. And also on this- Decision made on this record is moot. But sorry, my point was not that there's- we don't know if they're- not only that we don't know if there are cognizant employees doing this work, we don't know if there is a- if this contract was extended. I mean, I know Google says it hasn't been, but there's nothing in the record one way or the other on that point. That is something that could be determined in a subsequent compliance proceeding before the board. They could say there's no contract. This is essentially an impossible remedy. But on this record, we don't know that. But even assuming that there is no contract- Newspaper articles about layoffs of employees and termination of the contract. There's newspaper articles about the layoffs of those employees. Yes, there may be other employees. But even- so let's assume- Could the existence of a contract be relevant to whether there's a joint employer relationship in the terms of that contract? There doesn't- if your question is, does there have to be a contract in order for there to be- That is not the question I asked. Okay, sorry. No, I'm going to say it again. Could you say it again, please? Would the existence of a contract in its terms be relevant-  In analyzing joint employers? Yes. Okay. And we agree that it seems to me there's no dispute. I assume you don't- I mean, there's articles about this. There's no basis for including- accusing counsel here of misrepresenting anything. There's no- the contract on which the decision was based is gone. That is gone. They don't have a contract with Cognizant, full stop. Don't have a contract. And so if there could be humans there that used to work for Cognizant that are still at Google, I don't know. But for purposes of a joint employer decision, which requires a very careful analysis of the relationship between the two companies, it does feel like there should have been a very substantial upheaval here that would at a minimum require new analysis, by the way. So I think if all of that is true, there's still a lot of controversy here, because based on the order in this case, there are other remedies besides the direction to bargain, the present order to bargain, that go to Google if Google is a joint employer. The union's petition might not be moved, but Google and Cognizant's petition for review would be. I don't think so, because in addition to the order to bargain, there is the order to post the remedial notice or to mail it to the former employees. That is something that Google would still have to do if it was a joint employer. There's an ongoing cease and desist order. Joint employer at the time, it does that posting and mailing? Would it have to? No, I don't think so. Because it is saying, it is saying... What does the notice say? It says a variety of things. It's in the board order. It says that we will not refuse to bargain with Alphabet Workers Union over this. How is that not going to be mooted if in fact... They still have to, even if they're not currently bargaining, there's other things it says. I know, but the poster's going to be inaccurate. I don't know what they're supposed to post. If there's no union... The employees that the union was elected to represent aren't there. But it shows... And there's no contract basis for it. It is, there's a statement of employee rights that is... I'm trying to find it so I can get your exact language. Here. I think it's... Are you a JA-27? I am at the fourth page of the 2024 order, appendix notice to employees that we are looking at. I apologize, I don't have the JA number with me, I'm sorry. Sorry, is it the 2024 order? The 2020, the last page of the 2024 order. That starts appendix notice to employees... Yes, yes. It says federal law gives you the right to form, join, or assist a union, so on, so on. So, can I read a little bit? Instead of you saying what... Instead of you pointing to parts of it, let me point to parts of it, and then you tell me why. It's still not moving. It's referring to the Alphabet Workers Union, local 9009, and then from there on out it just calls it the union. One of the things it says, we will on request bargain with the union. And how can Google on request be required to bargain with the union when the union's employees are no longer... When the union's members are no longer Google employees? So, I think that doesn't... With that, if you're correct on that, then I think what that means is perhaps that not everything in the posting is correct anymore, but that doesn't mean they don't have an obligation to send the notice, and that perhaps the notice will be amended. They don't have an obligation to send an incorrect notice? No, not necessarily. They could just amend it unilaterally? They couldn't do it unilaterally. They couldn't do it unilaterally. I would not go that far. But for example, in cases where the board wins in part and loses in part, and we have to do a Rule 19 judgment, sometimes that would involve a... We would send along with our proposed judgment a proposed notice, and we could essentially reform the notice to the finding of the court, so that they would be able to file a response, and the court would, of course, rule on however it would like. I would point out also that... But if we just do what you want us to do and deny the petition, then we would not be putting you under any legal obligation to amend this incorrect notice. I think at the time of the board rule, we were just saying now it would be inaccurate. I see what you're saying. I think that is something... Excuse me. Yes. I mean... We have new employees in Google who want to be represented by a different union, and then they're being told that this is the union that I'm having. Right. So that is something I think, I guess, we would have to figure out. Okay. So the bargain order. So what else? Sorry? So what else is relevant? So the notice remedy, and I would... Notice remedy is sending the same thing to the employers? Sorry? And the notice remedy is the content of the notice the same as this? This appendix. This poster, yes. Yes. Okay. So that's got to get... That's out also? That's got to get revisited. Revisited. I'm not sure it would be out altogether. And that's it. Also, there's an ongoing... Sorry? Surely this has happened to the board before. Let's assume at least, and I'm sure counsel for Google and Cognizant will confirm, implied contract or unwritten contract. And when the press says that the employees are laid off, that they aren't still working for Google, what is the notice they're supposed to send? You had rights they weren't adhered to for two months? Sorry? Perhaps. I mean, there is a reason why these notices are posted. There is an informational aspect to them so that employees are aware of their rights and are aware that there has been a violation, even if the remedy... I mean, there are notice postings, even if there is no other remedy. And I suppose... It's not a remedy, but if it's... I think you could analogize it. Is there a precedent of issuing these notices when 100% of the employees are no longer working? Yeah. I think an analogous situation is when a business has closed. There was a recent decision at the Second Circuit where it was a school and the school claimed that it had closed. They no longer had any employees. And the facts aren't exactly the same because... Because the question in that case was whether there should have... One of the questions in the case was whether there should have been an election at all, whereas no one disagrees there should be an election here. But the fact that is analogous is that there's... It was the argument that there simply are no other... There are no employees in this bargaining unit anymore. And the court, the Second Circuit, enforced the board's order in that case. I'm not sure. It was one of those memorandum opinions. I'm not sure how much detail was in the opinion itself. They default with their rationale? I think similar to what I was saying is that there's this informational aspect to the order that providing the employees with notice of their rights, notice of the violation that had occurred. Well, who is... I mean, Cognizant could send the notice, right? But both Google and Cognizant violated the act. And so that is... Well, presumably they don't both have to mail the notice. Even if the contract were still in effect, only one of them has to send it, correct? Did you say they both have to send it? Everyone's going to be getting all this duplicate mail? That can't be right. And presumably Cognizant is the one that has all the personnel record information, including addresses of employees to mail things to. So the question here is whether Google is a joint employer, not whether Cognizant was an employer. Cognizant disputed that. So that remedy could still run against Cognizant if one were to think... I mean, put aside that the notice might have to be rewritten or could just be coming from Cognizant. I don't know. Cognizant hasn't disputed that. So Cognizant can issue the notice. I assume in joint employer cases, they don't both duplicate. Sending notices. I don't, I wouldn't think so for the reason you said, but I guess I can't say 100% for sure. Even if a notice still has to go, Cognizant can send it. I think ask isn't mentioned. So what's next? I think it would be signed by... The notices are typically signed by representatives from the employer. So it might be that both Cognizant and... Even if it's just one copy of the notice, maybe both Cognizant and Google representatives sign it. So other points, there's the other... I know you've been through this with the other capital, but there are these other pending unfair labor practice charges that are being investigated before the board and Google's liability under those would be keyed to its finding as a joint employer. There's the severed make whole remedy. And if the board subsequently does issue that remedy, the scope of Google's monetary liability under that remedy would depend on whether it was a joint employer. Is it right that if this all feels like stuff we don't have the right record in front of us for, to decide any of these issues? And it seems like we would be deciding an issue that just doesn't reflect the facts of the case as it comes to us. If we send this back and vacate it, we'll just decide vacature first. If we send it back to the board and say, the world has shifted here, whatever the relationship is, if anything, it's nothing remotely like, as best we can tell what it was before, you all need to do a do-over here. Would that do-over include a fresh determination of what of this? Because certification issues are forward-looking. Wouldn't you have to do a fresh determination of whether as of the day the board looks at the case again, let's just say six months from now, there is still a joint employer relationship? I think only as to the prospective aspects of the remedy and the bargaining aspect of it, but not as to these other remedies we are discussing, because they have to do with- Vacate it, you would have to, in determining these new remedial issues that didn't exist before the contract ended. But they did exist before the contract ended. I believe these other, the liability from a coal relief, if the board orders that, is- That's a reserved issue. Sorry? That's the reserved issue. Yes, the separate issue, correct. Part of this case at all. The merits of it are not part of this issue at all, but how much Google would owe under that remedy, if the board issues it, depends on whether it was a joint employer at the time it was refusing to bargain. That's- So, I get as to the remedies that are before us now, that would be one and out. But as to something, let's say two years from now, the board gets around to looking at that issue, does it not have some obligation to look at it under the circumstances of the time it's ruling? Because it's looking at it at the time the violation occurred. So if there was a refusal to bargain while the old contract was not in effect, then the joint employer status of Google Incognizant is determined based on the facts then in existence at the time of the violence. Does that mean you have to show some make whole remedy for two months? And the board's going to decide that somehow something extraordinary happened in the certification challenge to make make whole remedy appropriate when the certification only existed for two months? If the board does issue that remedy, and we're assuming that there is no more contract- It would be a great case to take on for XLO, wouldn't it? Where there's only a two month relation. I mean, you're going to have a lot of issues to deal with and let's do it where there's only a two month relationship. I don't know what make whole remedy someone's going to get for two months. If someone wanted to challenge a certification. I mean, the board would really, I'm sorry. I don't, I mean, I will say I will have a lot of questions in that case. I'm sure you will. And I'll be here to answer them. But I don't think any of that actually goes to the mootness point because you can say, well, it would be silly for the board to issue a remedy for only two months worth of failure to bargain an XLO remedy for only two months of bargaining. But if it was going to make that silly choice, then it would be doing so based on the relationship that existed between Google and Cognizant at that time. And so that's why that question is still alive. The mootness analysis, is there not some level of rationality that we could assume on the part of the agency? Or not. There's, whether it's article three rightness, imminence, something that just seems to me, I'm having a lot of trouble conceiving that that one is ever coming to fruition. So you just, that the, the board might not ever issue an XLO remedy in this case. We've got precedent. This is where we are. There's all kinds of problems with trying to do a make whole remedy. And it would have to be a case where traditional remedies for a challenge in the case where they, this is their only chance to challenge the basis for certification challenge is made. I mean, it just seems to me. So is this a kind of, we don't even know when they're gonna rule on this darn thing. That's correct. Right. I think what I can say is that it isn't, there's a non-speculative chance that the board could issue an XLO remedy as to this case. And that's looking at that FERC case. That's, that seems to be the standards. They're non-speculative. Okay. I was really gonna put it in the speculative category given we don't even know if and when they're gonna rule on it. And then given this change in the factual circumstances, which would seem to be like the worst possible factual scenario in which to think a make whole remedy is appropriate because it was only two months. There's no identification of exceptional misconduct or bad behavior whatsoever. And then you have a very serious issue just because we don't have much joint employer precedent. Nothing to say who wins on the merits at the end of the day, but it's a very serious issue that needed to get litigated. Can you imagine a worse vehicle? Can you imagine a worse vehicle for the board to say, this is the one we're gonna. Well, then I'm happy to say I have these other arguments as well. If you think, well, that one's too speculative. Then we still have, we've been over it before, so I don't wanna repeat myself. But with this, the posting issue is the other pending unfair labor practice charges, which again are based on conduct that happened while the facts were as were litigated in this case. And so there was, there would be nothing new for the board to analyze to determine if there's a joint. If the question is, is there a joint employer relationship a year from now? Sure, we would have to look at a different record. But if the question is, was there one at the time this case was litigated and those other and for labor practices, the pending ones go to that question, then I don't think it would, the board would not have to reanalyze a new record to come up with its joint employer determination. If it's not moved. In my last minute, if it's not moved, yeah. I have a couple merits. Sure. The Google managers did not work side by side. In person or virtually with the cognizant employees, correct? They didn't work side by side. This was a largely a remote workforce. There was plenty of interaction between Google managers and the cognizant workforce through emails, direct messages, those kind of things. The Google manager, Google managers did not provide oral instructions on how the cognizant employees would perform their jobs. Is that correct? That is not correct. No. What oral instructions did they give? They gave, they instructed the board's finding was that Google instructed cognizant employees how to perform that work. We see that at the outset when there's training at the outset, we see that as there are new assignments being, new projects being assigned. And for example, there is testimony where cognizant employees say, well, when Google was introducing a new workflow, I think it's been named, that we would watch them do the work so that we would know how to do it. There are emails between, you look skeptical. Well, only because everything you've said, including emails, sounds like it may very well be not oral instructions. Oh, you're drawing things between oral versus written? Yeah. I'm not saying it's a distinction that's going to decide the case, but I was just trying to get the facts straight. I think that the Google brief says that Google managers did not work side by side with cognizant employees in person or virtually as they completed tasks, providing, quote, oral instructions on how to perform their jobs. And if that's wrong, let me know it's wrong. Let's see if there are any examples of oral instructions versus written instructions. I guess I don't know for sure in the example I just gave you where they were observing the Google employee do the work in order to learn how to do it if there was conversation at the time. I think at the outset in the, there is training at the outset, which I guess I can't say 100% for sure, but I assume had some oral component to it. They didn't just show them the PowerPoint silently. Google also says that Google managers did not provide individualized performance feedback. Is that correct? No, the Google employees reviewed some of the quality analysis, the QA scores, and had discussions with cognizant employees about them. There's testimony about that. Between Google and the employee. And the individual employees. Yes, there's some evidence of that. Email versus vocalized because they were remote. I don't know if it was a phone call or an email or something. Right, I'm not sure. Does it matter for joint employer whether it's oral or written as long as it's. I don't think so. Real time given in a virtual workplace. Right, not. I don't see any reason why it would. And there's really nothing in the regulation that makes that distinction. The supervision, the hours, the benefits. The board went through how there's evidence of direct and immediate control over those. As those terms are. I've got a couple more. I just want to see if you're on the same page as Google or not. And then I know you have arguments that even if Google's correct about these facts, they're still wrong about the outcome. Yes, they say nor did cognizant seed control over everything except hiring, firing, and compensation to Google. Giving Google exclusive daily supervision over cognizant employees.  It's very contrasting with International Transport Florida. It's saying. Google, sorry. Cognizant did not feed control over everything to Google. You definitely heard that. Sure. And then cognizant did not see control over everything to Google except for hiring, firing, and compensation. That's awesome. That's true. OK, and they didn't give Google exclusive daily supervision over cognizant employees. That's true. And I think this is my last one. Nope, that was my last one. OK, I appreciate your patience. Sure. So when we're talking about supervision, just to respond to something that Google's counsel said before, the board's finding as to supervision was that its top line finding was that Google actually instruct instructed cognizant employees how to perform their work. So the top line finding was instruction. There's components of that, examples of the training and the tools and resources. But those were not the board's independent reasons for finding supervision. It was going through instructions. And we have specific examples in the record of those. And again, maybe they were oral. Maybe they were written. I don't know. Here's a written one when the employee, a cognizant employee asked the Google counterpart, could you give me some specific protocols on how to do this particular task? It was if there was missing lyrics on one of the YouTube music pages, entries, and the Google employee responded with a link saying, here it is. Here's the specific protocols. There's this Google created resource that cognizant employees use that provides what a cognizant employee called very specific guidelines as to a variety of tasks. We talked about how they observe the Google employees do the work so that they know how to do it. This all goes to the details, control over the details of the performance of the work, which is how the supervision is defined in the regulation. There's a, well, said you've read the brief. There's plenty of evidence as to the performance metrics that Google sets as to the qualitative rubrics that Google creates. And one of those, one of the questions in the QA is that the cognizant people are supposed to answer is whether the, and when performing the tasks, whether the task protocol was followed. So Google on the front end is setting what those protocols are. And then on the back end, they're telling cognizant you need to evaluate and appraise the work based on whether they have conformed with those protocols that we have set. What should we do if we think the board was right about, the board found that supervision hours and benefits factors supported joint employment. What should we do if we find that they were right about one or some of those factors and wrong about one or some of those three factors? Sure. Well, as a legal matter under the regulation, you need one or more of those essential terms and conditions. So as a legal matter, there could be a joint employer finding based on only one of those. I think if the question is, once the board has made its finding, you knock out one of them and keep the other two or two and one or what have you. I think generally what would happen is remand to the board to reweigh the remaining factors and see if it comes out the same way. I think it's instructive when making the distinction between what counts for joint employer status and the things that are objectives, basic ground rules, all these words that Google is throwing around to look at this course decision in Brown and Ferris when it sets out a couple of examples where it says this would not count as joint employer evidence. And that's things like global oversight, advanced description of the tasks to be performed. And I think the facts here show that Google's evidence, that Google's control doesn't fit into those boxes. It's not solely an advanced description because it's ongoing and it's not just a description, kind of a service level description. It's very specific. So the specificity and the ongoing nature of Google's control is what separates this from basic ground rules and those kind of commonplace aspects of party to party contracting. And Google talks a lot, and this will be my last point unless there are other questions. Google talks a lot about how it kind of needs this level of control in order for the YouTube music program to work. It's very complicated. It's very important. And that's fine, but nothing in the board's decision prohibits Google from retaining this amount of control over the employees. But the point is, when it makes the decision to retain that control over itself, that carries with it legal consequences and obligations to the employees who are subject to that control. Can I see what you're... What if anything is wrong with this? Now, I am going back to mootness. Okay. We dismiss Google's petition on mootness grounds. We dismiss all but the retrospective compensation argument part of the union's petition on mootness grounds. We deny the union's petition with the part of it that says it was improper for the board to segregate out the compensation, retrospective compensation question. We vacate the board's decision under the SANS precedent that basically does months and years but in an LRB context. What that leaves for the board to do is to decide the retrospective compensation question. When it does that, it will have to, once again, decide whether Google is a joint employer. If it does decide that Google is once again a joint employer, it will decide whether to overrule the board precedent and apply retrospective compensation. I know... What are all the things you think is wrong? Well, one is that it would require the board to... It would require a relitigation of an issue that has already been decided. So it would be a lot of extra, I would say, unnecessary work. The joint employer issue? The joint employer issue. It was decided on... If representations are ever decided in a universe that doesn't exist, they wouldn't be redoing it over. They would have to say, OK, what's the relationship now, if any, and what are the terms of it? I don't think so, because if I understand Judge Walker's scenario here, what the board is deciding is whether to issue the, using shorthand, the XLO remedy for the period at which Google and Kainizen were refusing to bargain. Oh, I misunderstood. I thought he was saying we would deny that one, because... OK, I misunderstood the question. I apologize. Well, I'm not... I thought XLO was out. We would deny the union's part of the petition where they say, you should have done it already. You should have done the XLO. And so my understanding, correct me if I'm wrong, please, is that, so you then... So then what is still before the board, in this case, is the separate issue of whether to issue an XLO remedy in this case. And if that's true, the board would have to decide the scope of Google's remedy is, under the XLO remedy, would be the time at which it was a joint employer, which was when the facts existed as was litigated here. So if you're saying it's really just for those two months, then it was Google a joint employer with an obligation to bargain in January and February of 2024. And so those are the facts that the board has already looked at and parties have already litigated. But I suppose the board actually would not have to reach the merits on that question if it decided that the requested compensation remedy is inappropriate. That's correct. If there's not going to be that remedy, they wouldn't.  So what, let's... So the only issue is then they would have to decide that it is appropriate. And only if that. Would they have to, in your words, redo the merits. Right. I think that's true. They have to do anything more than say we hereby adopt again our prior record. Because we vacated this. So they're going to, you know, we can do that. I don't know if they'd be wise or not, but they could do that. And the board would just see what I said before. Again, assuming they want to do this for their XLO, this is the vehicle they want for XLO. And then both issues would come up to us. I can see that happening. I think that, I mean, there are the other reasons why I think it's not moot aside from the XLO remedy. So, but if you're rejecting me on that one, what else would be the problem with that? I think there is a, there's a virtue to having developed law in this area. And I realize if it is truly moot, you can't do an advisory opinion. I'm not asking you to do that. But in considering the mootness issue, if it's a close call, perhaps one consideration is this is an area where there hasn't been a lot of guidance down to that many of these cases, even though I seem to be here for all of them. And so that is one thing to consider. And the fact that... Fortunately, keeping you busy is not part of our mootness analysis. Nor is there any rounding up That's because it's jurisdiction. Don't you like being here? Oh, I love being here. This is fun. Thank you. And just the fact that these employees voted unanimously for union representation. And it's important to vindicate the exercise of their rights under the NLRA. So I hope that this case stays alive for that purpose and for the others we've discussed. Thank you very much, counsel. Thank you. Appreciate your assistance. All right, we'll give you... I guess, Ms. Campbell, you want two minutes to rebuttal and then we'll give you the same amount, Mr. Silvera. Did I say that right, Silvera? Yes. I'll be brief, but I would be remiss if I didn't make this point. The union urges this panel to deny the petitioner's... the employer's petition and enforce the board's order, regardless of what other the court decides to do with the union's separate petition for additional remedies. And the reason is that the board certified this unit in May of 2023. Based on my understanding of counsel's representation, the contract ended in February of 2024, if I recall correctly. So we had eight or so months under which these employers had an obligation to bargain with their employees. And they still have an obligation to bargain over the effects of ending the contract. The effects of which were 50 people in the Austin, Texas area lost their jobs, jobs that they used to pay their rent and support their families. And so both Google and Cognizant have an obligation to bargain once, even if it's one last time, over the effects of the termination of that contract. Usually those negotiations have a lot to do with severance and those types of things. I genuinely do not know. Do you know if they lost their jobs with Cognizant? That's one possibility. Were transferred within Cognizant to other Cognizant responsibilities? That's a second possibility. Or you don't know. I know that the workers in the unit that I got to know during hearing and the election process were terminated sometime after the unit was certified. And we think that additional termination terminated jointly by Google and Cognizant.  While long before the contract expired, we believe we understand. Again, I want to be careful to represent to the court that we weren't there. But our understanding is that other folks were brought in to do that work. That's why I did not know about the termination of the contract. I don't have direct knowledge of that. But those folks. And so that was one of the ULPs that's actually pending now. The retaliatory termination of the workers who organized. But even if that, if our understanding is correct, they brought new folks into the bargaining unit. Those folks who we don't know would be part of the effects bargaining and would have the opportunity to negotiate for the effects of their termination as well. And so for my clients, they are, the issue is not moved because and it's not academic about what notices get posted or sent to people. It's very real because these are 50 individuals lives and livelihoods that they have one last shot at bargaining over. I thought maybe my first question to you was do they still work for Google? I'm doing work for Google. And I thought you said you didn't know. Yeah, I thank you for reminding me to finish my thought. Those folks that I know that I can represent were part of the vote. I don't believe that any of them work for Google or Cognizant either one at this time. If there were folks who were employed and were in the bargaining unit at the time the contract ended, the union just was not able to stay in touch with those folks in the same way. And so I can't make a representation about that. And you have any more points to wrap up?  My last point is your honor asked my opposing counsel what it would take, what facts it would take to find supervision, joint employer factor for supervision. And if I wrote down his answer correctly, he said actually instructing employees on a daily basis. And that is precisely what happened in this case. And so there is more than a factual basis to uphold the board's decision on joint employer and remand, and I'm sorry, and enforce that order regardless of what you do with our petition and allow these folks opportunity to bargain over effects. When did the union first request bargaining? Do you have that date? It would have been right after certification maybe. So I thought the board order was in January. Certification, I apologize. Certification is in the record at Joint Appendix 727, and that's the date that I'm going off of. So they didn't have any obligations until you first requested to bargain? They did. Certainly they had an obligation beginning on that date. And for those eight months or so, I were here because they didn't they didn't bargain during that time, but they still have. They didn't have to bargain until you first requested to bargain. Right, which would have been, I apologize. I don't have a letter, but we did. We did that immediately after the certification by letter to council. Right, that's the board certification order or the regional director? The certification order comes from the board. So I had January 3, 2024, is that date you mentioned the date May, the prior May of 23. May 4, 2023, again at Joint Appendix 727. That's when the regional director certified the union. That is that is the official certification that comes out. And so our position would be that their obligation to bargain happened then and we demand that the workers demanded bargaining shortly thereafter. Even when the board denies review of the regional director's decision? Correct. That's your position. I see what you're saying, that they were they were essentially appealing through the board's procedure while after certification. Certification is when the bargaining obligation begins. And if if folks want to just by the regional director, not even the board denied review of the regional director's decision in July of 23. Sure, that's right. Yeah, there are their obligation begins at the time of certification. By the regional director. By the regional director. Yes, so May 2023. What if the union loses at the board stage? Certainly they can avail themselves of the appellate procedure, the petition for review, and that's their choice. They did that here. And, you know, I think if they lost and it came back down, then that would just be something that parties would hash out. If it came back down as a single employer, then I mean, effectively, they wouldn't have reached the first contract ever in a couple of months. Anyway, that that's extremely unlikely, but those are the kinds of things that would get hashed out and bargaining and do regularly all the time. Thank you. Friends, I just want to make three quick points and answer any questions you may have. First on the mootness issue and the proposed remedy that Judge Walker suggested. Again, as long as the underlying joint employer ruling is being vacated, that's fine. And then they can go ahead. And if they say as adopted, we can then challenge that on appeal. That all works out. I want to pin some things down. What's that? I want to pin something. I would like this representations in writing after arguments. And that is the contract that was subject to the board's analysis here has in fact expired. On February 29, 2024. Yes, I think that's what you're.  So second, there's no implied or unwritten contract between Google and Cognizant. Correct. Now, I do want to be clear about the contract expiring. That was the contract between Google and Cognizant for this Austin unit to be working. Yes, that that contract expired. There's no implied contract as to that. I do believe that Cognizant workers elsewhere may be doing some of this work, but it's not this Austin unit. So that's the next question. OK, so then there is. There may be a contract between Google and Cognizant outside Austin. Yes, I believe outside the United States, actually. Outside the United States. OK, and are the terms of that contract the same? I do not believe so, but I can't make a representation here right now in terms of the level of similarity. OK, and is that contract ongoing? I would have to. I would have to check on that. And are any of the employees from the original bargaining unit? Part of that new contract? No, I mean, on that point, I do just want to clarify something for the record here. When the contract terminated, that did not mean that those employees lost their jobs. Cognizant has a deployable bench. What happens essentially is they get assigned out, allocated to certain projects. These paper articles about them getting laid off. Yeah, well, what happens is that when the contract with one of the parties that is seeking your services expires and they go back from the deployable bench and then Cognizant, they can within Cognizant seek other jobs at Cognizant. Other projects. Those folks still employed by Cognizant? I don't believe they are employed at this point, but my point is they did not get terminated upon the expiration of the contract. Because they've all been fired by or laid off by Cognizant. Or left, did not seek actual other opportunities within Cognizant. I think there's a variety of different circumstances there. But the point is that it's not as if, because I heard a point in counsel say that, well, they were fired by Google and Cognizant and that's simply false. I actually thought, and I may have misheard her, but I thought once we kind of got to the bottom of it, she was talking about people who were fired before the Google Cognizant contract expired. They were fired, in her view, in retaliation for trying to form a union. Yes, and I think they have a separate ULP over that. I'm not aware.  But I think that is a separate question of the people who were in the would-be bargaining unit and still employed when the contract expired in February 2024. What happened to them? And it sounds like you're saying none of them are still doing work for Google. And they were given an opportunity to maybe find another place at Cognizant. But at the end of the day, some were laid off and some may have left. As far as I know, that's correct. But again, it's because they were with- It would be nice to include information from Cognizant about whether the employees in that unit, that was the certified unit, were terminated or laid off prior to the contract expiration. Yeah, again, I believe that that is subject to separate proceedings, separate ULP proceedings. But I understand. They should just know whether they were on their payroll or not, and if not, how they were offed for purposes of answering this informational question from the court. Sure, I think that- I'm asking you to have a line that says, and we hear one, even assuming it was true, that we hereby confess to an under- Right, yeah. I was asking for that. I want to know factually what happens to that group of people, as in, they are still employed by Cognizant, they were laid off by Cognizant on X date, but they were terminated by Cognizant on X date. It's 50 employees, 50 or 60 employees. Right. So you won't do that. Okay. Okay. I'm sorry, I have to say that. Did I make my one last point? Yeah, on the actual joint employer issue, there was a discussion of working side by side, and I think that is important because all of the cases that the board cited in its order, the quantum resources case, the international Florida case, and then the gourmet awards suit, all of those were working side by side cases in the sense that you had employees of both the party contracting for services and that contractor's employees that were working side by side doing the same job, essentially. Here, no one at Cognizant did the same job as people at Google. I mean, this is why Google actually outsourced this work is because they wanted Google employees to be working on actually the software development, upgrading the system. And this maintenance work, because this is really, it's just, it's almost like, digital janitorial work in a certain sense, right? It's essentially, you're looking through the database and saying, does this look right? Is this misspelled? Does this have the right number of tracks underneath it? And all of that is the work that Cognizant employees were doing. The accuracy of their online The accuracy. But these public, right? Actually, and they brought to that their music industry knowledge. So they did bring some specialized knowledge to that. And then they had to learn how to work on just what they're doing, right? Like, what tools do you use to go ahead and update the name of a song that's misspelled, right? But that's not instruction in the sense that we think of under the 2020 rule. If the case is moved, this next question, it's not going to matter. But there's something in the record about one Cognizant employee getting individualized feedback from Google. What's your response on that? Sure, look around JA 199 to 202 and you'll see the actual testimony of the person that he says he got individualized feedback from a gentleman named John Weinman. And what he explains is that Google employees will do these calibration reviews where they're actually looking at reviews that, in this case, Cognizant has already done and they're doing QA to make sure that the accuracy is correct, right? So they're essentially seeking to ensure that the contract is being performed as a contracted form. Is that on 532 to 535 or 6? I think that's a few different pages, 532 to 536. But yes, the one form on 532 to 536. As I said, I think it's a couple of different things. If I can grab it. I think it's a couple of different screenshots that are not necessarily all the same. But that part of the review. But my point is, yes, the review that actually says here's the score for this individual. Yeah, that's the bottom line of it. This is like one. It's print way too small for me to even see. It is so many lines. Yes, some granular information. So this part of the review process. Yeah, no, that is not the QA. I don't think that's the 5. What is it? What QA are we at again? 532, 533, 534, 535. Oh, yeah, that's a total on 535. That's workflow. That's essentially here are various tasks that can be picked up for Cognizant employees to work on it. Does anybody check? Who makes checks to make sure this is all done? What's that? Who checks to make sure this is all done? Checks to make sure that all the tasks are done. I believe that this goes to Cognizant and then individual Cognizant employees can pick them up. And then there is a Cognizant tier that says, hey, has our unit actually done all of the things that Google has asked us to do? What's that? This doesn't go to Google. I mean, Google at some point has to make sure that the various tasks it's contractual perform. Have they actually been completed? But that doesn't mean that they're the ones evaluating whether they were done accurately. That's something that Cognizant does. And then the 530. Yeah, that that total thing up and how much time it took them to do it. The volume that they did. This is all for Google, right? Those are forms that get filled out by Cognizant employees and Cognizant ultimately looks at. Does this form go to Google? Does it go to Google? I believe Google has access to it, but Google does not actually. Google just creates it. Google creates the form. Yes, because it's the one that is higher. Cognizant 536 evaluation thing. Yeah, I'm trying to find the. Evaluation. Yeah, 536 is a holiday schedule. I just have mine. It's not a holiday. Maybe it's here. So 562 is what I was referring to. No, I think. Oh, actually, I think it's 560. I see it's a different number. Yeah, it's now. That's also took off my eyes to read. 562. What's 566? 566 is. Yeah, that's an end of day form saying what a Cognizant employee has done. But 562 is a form. That's right. Yeah, so this is Sam's end of day form. Yeah, and this goes to Cognizant to Cognizant. I believe Google has access. I think all this because it's on a Google form essentially, but in terms of who uses it. That's Cognizant. Who fills it out and then and then know who reviews it. And then those Google and Cognizant see this. Google has no. I have to monitor. Google has executed. Right, Google. Google does the spot checking and the compliance control. So that's what 562 is. That's an example of a task where Google has essentially done a second review of that. And it does a few of these that through the system. Yes, the Cognizant employee can see, but the testimony is clear. J199 to 201. You only do a few of those or was there a factual? She said he did that about monthly. Monthly calibration reviews is what he would do. No, not for each employee. He didn't. It was a random sampling. This is the point. It wasn't individual employees. This was all. I would do a sampling of the units work. Right? So there are a number of people that are assigned to this workflow. I don't care who is doing these individual assignments, but to monitor the performance, the contract, I have to look at some of these and say, is the work being done the way that we contract? Is it being done accurately? Are they maintaining the accuracy of the database? And so they would do that QA process and at J199 to 201, Mr. Weinman clearly says, yeah, I would go ahead and fill it out, score it, and then I'm done with it at that point. I never had any back and forth with individual employees about that. When did that ever happen? With Cognizant. Cognizant could do whatever it wanted with this. It could use them to evaluate its employees. But Google wasn't doing individual performance appraisals. All it was doing was making sure that the services that it contracted for were getting done. And it was doing that at a QA level. And that's completely consistent with Southern California Gas and Larico and all these other board precedents that were completely ignored by the board's orders, which is why as much as we try to talk about the facts in this sometimes, I think we do have to also look separately at whether this rationale was arbitrary and capricious. Because it's very clear that the board did not look at a single one of the cases that was the foundation for the board's rule in 2020. And all of those cases support the fact that the type of things that were happening here, you know, advanced instructions, checking to make sure the contract has been performed. Occasional interaction with employees. All of that does not make you a joint employer. And the board didn't look at any of those cases. Okay, how do I do this? How do I deal with this? Very, remember what the rule says, isolated, sporadic, and de minimis. Right? That's substantial. Daily, that would not be isolated, sporadic. But it's not de minimis. And if you look at that thing, sure, to be crystal clear, I'm not trying to lock you on anything here. But if there were daily or almost daily interactions requesting information on how to perform these types of things, that would not fall within your sporadic intermittence. Right. And I think it would depend on the amount, because in Southern California, even if it's daily, it has to be more than once a day. In Southern, well, I think I can point you to Southern California gas, where it talked about there might be daily, you know, I need this cup of coffee. I need this, right? The same thing. I'm talking about the work itself. Oh, the work. Yeah. In terms of almost daily people saying, how do I do this to Google employees? No, the record doesn't show that. And if there were a real, like, constant level of I'm asking Google about all this and I'm not asking my cognizant managers, that would be a different scenario. That is not this record. We have a few isolated, sporadic, and de minimis instances in here. That's my point, too. Thank you very much to all council for the helpful discussion. Thank you for submitting.
judges: Henderson; Millett; Walker